UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PALLA FARMS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>GEMINI INSURANCE COMPANY,<br><br>Defendant. | Case No. 1:23-cv-00277-JLT-CDB<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT<br><br>(Docs. 31, 32)<br><br>ORDER RESOLVING MISCELLANEOUS MOTIONS AND REQUESTS<br><br>(Docs. 45, 47, 58) |

Pending before the Court are the cross-motions for summary judgment by Plaintiff Palla Farms, LLC ("Palla") (Doc. 32) and by Defendant Gemini Insurance Company ("Gemini") (Doc. 31). The parties filed their respective oppositions on April 16, 2024 (Docs. 43-44) and replies on May 21, 2024 (Docs. 51-52). The parties have consented to magistrate judge jurisdiction for the limited purpose of deciding the cross-motions for summary judgment now before the Court. (Doc. 28). For the reasons set forth below, Gemini's motion for summary judgment will be granted and Palla's motion for summary judgment will be denied.

**I.     Background**

On March 11, 2024, pursuant to Local Rule 260 and the scheduling order, Palla and Gemini submitted a joint statement of undisputed facts (Doc. 34 "JSUF"). The parties stipulated that, for the purposes of the cross-motions for summary judgment before the Court, the following facts referenced in the JSUF are undisputed:

Gemini insured Dole Enterprises Inc. ("Dole") under several energy commercial general

liability insurance policies for consecutive periods from September 17, 2011, to September 17, 2015 ("CGL Policies"). (JSUF Nos. 1-2, citing Exs. A, B, C, D, E, F, G, and H).  On September 15, 2014, Palla filed suit against Dole and others in an action titled *Palla Farms LLC v. Crimson Resource Mgmt. Corp., et al.*, Superior Court for the County of Kern, State of California, Case No. S-1500-CV-283013-LHB (the "Underlying Action").  (JSUF No. 3 citing Ex. I).

According to its allegations in the Underlying Action, Palla operates orchards in the San Joaquin Valley where it grew almonds, pistachios and cherries.  Palla drew groundwater for its farming operations from the Central Valley aquifer.  (JSUF Ex. I at ¶1, S at ¶1).  Dole owned mineral rights and operated oil wells in the vicinity of Palla's orchards.  (JSUF Ex. S at ¶¶20-21).  Palla alleged that saltwater was a byproduct of oil extracted from Dole's wells, and that Dole would dispose of this saltwater by injecting it back underground through old, repurposed oil wells. (JSUF Ex. S at ¶30).  Palla asserts these injections caused saltwater to escape from the injection wells that contaminated the Central Valley aquifer from which Palla drew fresh water. (JSUF Ex. I at ¶¶24-25).  As a result, Palla suffered damage to its almond, cherry, and pistachio trees, including the death of thousands of trees and reduced crop yields.  (JSUF Ex. S ¶52-53).

Upon Palla's commencement of the Underlying Action, Dole notified its insurers, which included Gemini and Chubb Custom Insurance Company ("Chubb").  (JSUF Ex. J, CC).  Chubb agreed to defend Dole in the Underlying Action subject to a reservation of rights and tendered to Gemini a letter asserting that it should also contribute to Dole's defense.  (JSUF Ex. CC at GEM001215, 1217-18).  Through a letter dated December 23, 2014, Gemini acknowledged that Palla was suing Dole for damages out of the alleged saltwater contamination but denied any obligation to defend or indemnify Dole.  (JSUF Ex. K at GEM000457-58).

After several years of litigation in the Underlying Action, on June 15, 2018, Palla's counsel transmitted a letter to counsel for Gemini asking Gemini to "reevaluate its prior denial, and acknowledge coverage for the subject loss."  (JSUF Ex. M at GEM000822).  Gemini responded with a letter acknowledging that Palla's complaint "does contain some allegations of 'property damage,'" but claimed that such property damage was barred by the pollution exclusion in its policies.  (JSUF Ex. N at GEM000851).

2

Thereafter, on November 14, 2018, Palla, Dole, Chubb and another defendant to the Underlying Action attended a mediation session.  (Doc. 32-1 "Eli Decl." at ¶¶3-5).  Chubb and Palla advised Gemini of the upcoming mediation and asked that it attend.  (JSUF Exs. O, P).  Gemini internally acknowledged receipt of the invitation (JSUF Ex. BB at GEM000367) but did not respond to the letter or attend the mediation.  (Eli Decl. ¶¶4-5); *cf.* (Doc. 36 "Matz Decl." at ¶17).

On August 14, 2020, counsel for Palla sent Gemini a letter advising it that Palla, Dole, and Chubb reached a tentative, partial settlement which consisted solely of damages covered by the Chubb policies.  (JSUF Ex. Q).  Counsel for Palla invited Gemini to contribute to a settlement of any remaining claims in exchange for payment of $1 million.  (JSUF Ex. Q).  Gemini rejected Palla's demand and reaffirmed its coverage denial through a letter dated August 24, 2020.  (JSUF Ex. R at GEM000868).

On August 14, 2020, Chubb, Dole and Palla finalized their settlement, and reported to Gemini that this settlement released Dole from any claims covered by the Chubb policies.  (JSUF Ex. Q).  In addition, both Chubb and Dole assigned any rights they had against Gemini to Palla.  (Eli Decl. ¶8).  In exchange, Palla agreed not to execute any judgment in the Underlying Action on Dole's personal assets.  *Id.*  Chubb terminated its defense obligation, withdrew from Dole's defense and filed a motion to be relieved as Doles' counsel of record.  Eli Decl. ¶9.  The trial court granted the motion on September 3, 2021.  *Id.*

Following counsel for Dole's withdrawal, on October 13, 2021, Palla filed a second amended complaint in the Underlying Action.  (JSUF Ex. T).  Dole tendered its defense of the second amended complaint to Gemini via a letter dated November 5, 2021, enclosing a copy of the second amended complaint.  *Id.*  Gemini's claims adjuster left a phone message with Dole's principal (Karen Dole) on November 16, 2021, as well as an email acknowledging receipt of Dole's tender on November 18, 2021.  (JSUF Ex. CC at GEM001204).

Dole did not file a responsive pleading to the second amended complaint, and Palla filed a request for entry of default against Dole.  (JSUF Exs. U,V).  The Court in the Underlying Action entered Dole's default on December 16, 2021.  (JSUF Ex. W).  Dole was served with the request

for entry of default and forwarded it to Gemini via email on December 22, 2021.  (JSUF Ex. X).

According to Gemini's internal notes, the claims adjuster spoke with Karen Dole and discussed

the risk of a default being entered.  (JSUF Ex. BB at GEM000364-65).  Ms. Dole told the adjuster

that "her husband had passed away and the company was not making much money at this time,

[and] that they really didn't have the resources to fund a defense." *Id.*  Gemini's claims adjuster

sent a follow-up email on December 27, 2021, acknowledging the risk of a default but taking no

action.  *Id.*

On January 7, 2022, Gemini's counsel sent another letter to Dole renewing its denial of

coverage and refusal to provide a defense. (JSUF Ex. Y).  On September 20, 2022, the trial court

in the Underlying Action entered a default judgment against Dole and awarded Palla

$3,438,808.04 in damages (the "Default Judgment").  (JSUF Ex. Z).  On November 15, 2022,

Palla's counsel sent Gemini a letter demanding payment of the Default Judgment.  (Eli Decl. at

¶15).  Gemini did not respond to the demand letter.  Thereafter, Palla commenced the instant

action in Kern County Superior Court, which Gemini removed to this Court on February 24,

2023. (Doc 1).  In the operative, first amended complaint, Palla asserts against Gemini numerous

causes of action for breach of contract and the implied covenant of good faith/fair dealing and for

declaratory relief relating to Gemini's duty to defend and to indemnify Palla (as Dole's assignee)

in the Underlying Action. (Doc. 5).

On February 7, 2024, the parties' filed a stipulated request to amend the scheduling order

and consented to magistrate judge jurisdiction for the sole purpose of presiding over the parties'

anticipated cross-motions for summary judgment on the issue of Gemini's duty to defend Dole in

the Underlying Action based on a stipulated set of facts. (Doc. 26).  The cross-motions for

summary judgment were fully briefed as of April 16, 2024, and on May 23, 2024, the Court

convened for hearing and oral argument.  (Doc. 56).[1]  During the hearing, the Court noted that the

---

[1] During the hearing, counsel for Gemini withdrew its motion for administrative relief seeking a
remedy in connection with Palla's overlength reply brief. *See* (Doc. 47).  Further, the Court took under
submission Gemini's motion to compel Palla to produce a complete, certified copy of a deposition
transcript upon Palla's complaint that Gemini only proffered uncertified excerpts of the transcript in
support of its cross-motion for summary judgment.  (Doc. 45).  Because the Court concludes the disputed
transcript excerpts do not present material facts relevant to the parties' cross-motions, the Court will deny
Gemini's motion as moot.

4

1  parties had identified disputes concerning the agreed-upon scope of discovery for and permissible

2  issues to be raised in the cross-motions for summary judgment.  The Court invited the parties to

3  meet and confer about any agreement to narrow the issues for the Court's resolution in ruling on

4  the cross-motions for summary judgment.  On June 18, 2024, the parties filed a stipulated request

5  to withdraw certain issues from the Court's consideration on summary judgment.  (Doc. 58).

6  **II.    Standard of Law**

7      Summary judgment is appropriate where there is "no genuine dispute as to any material

8  fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Washington*

9  *Mutual Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  An issue of fact is genuine

10  only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party,

11  while a fact is material if it "might affect the outcome of the suit under the governing law."

12  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818

13  F.2d 1422, 1436 (9th Cir. 1987).

14      On summary judgment, each party's position must be supported by: (1) citing to particular

15  portions of materials in the record, including but not limited to depositions, documents,

16  declarations, or discovery; or (2) showing that the materials cited do not establish the presence or

17  absence of a genuine dispute or that the opposing party cannot produce admissible evidence to

18  support the fact.  *See* Fed. R. Civ. P. 56(c)(1).  The court may consider other materials in the

19  record not cited to by the parties, but it is not required to do so.  *See* Fed. R. Civ. P. 56(c)(3);

20  *Carmen v. San Francisco Unified School Dist*., 237 F.3d 1026, 1031 (9th Cir. 2001) (on summary

21  judgment, "the court has discretion in appropriate circumstances to consider other materials, [but]

22  it need not do so").  Furthermore, "[a]t summary judgment, a party does not necessarily have to

23  produce evidence in a form that would be admissible at trial."  *Nevada Dep't of Corr v. Greene*,

24  648 F.3d 1014, 1019 (9th Cir. 2011) (citations and internal quotations omitted).  The focus is on

25  the admissibility of the evidence's contents rather than its form.  *Fonseca v. Sysco Food Servs. of*

26  *Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004).

27      "The moving party initially bears the burden of proving the absence of a genuine issue of

28  material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).  To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party meets this initial burden, the burden then shifts to the non-moving party "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 323).  The non-moving party must "show more than the mere existence of a scintilla of evidence." *Id.* (citing *Anderson,* 477 U.S. at 252).  However, the non-moving party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The court must apply standards consistent with Rule 56 to determine whether the moving party has demonstrated the absence of any genuine issue of material fact and that judgment is appropriate as a matter of law.  *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  "[A] court ruling on a motion for summary judgment may not engage in credibility determinations or the weighing of evidence." *Manley v. Rowley,* 847 F.3d 705, 711 (9th Cir. 2017) (citation omitted).  The evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party.  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 772 (9th Cir. 2002); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

In addition, when the parties submit cross-motions for summary judgment, as they have done here, each motion must be considered on its own merits.  *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  Accordingly, the Court will address each party's grounds for summary judgment and decide whether the facts conclusively establish liability or the lack thereof for each party.

///

6

### III.    Discussion

#### A. Duty to Defend – Governing Law

"An insurer has a very broad duty to defend its insured under California law." *Anthem Electronics Inc. v. Pac. Employers Ins. Co.*, 302 F.3d 1049, 1054 (9th Cir. 2002).  "The California Supreme Court has stated that 'the insured is entitled to a defense if the underlying complaint alleges the insured's liability for damages *potentially* covered under the policy, or if the complaint might be amended to give rise to a liability that would be covered under the policy.'" *Id*. (quoting *Montrose Chem. Corp. v. Super. Ct.*, 6 Cal.4th 287, 299 (1993) (emphasis in original)).  In California, "once the insured has established potential liability by reference to the factual allegations of the complaint, the terms of the policy, and any extrinsic evidence upon which the insured intends to rely, the insurer must assume its duty to defend unless and until it can conclusively refute that potential." *Montrose*, 6 Cal.4th at 299.  "Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." *Id*. at 299-300.

"The determination whether the insurer owes a duty to defend is usually made in the first instance by comparing the allegations of the complaint with the terms of the policy." *Anthem Electronics*, 302 F.3d at 1054 (citing *Montrose*, 6 Cal.4th at 295).  Facts extrinsic to the complaint may trigger a duty to defend when they show that it is possible that the claim may be covered by the policy. *Id.*  The insurer must conduct a reasonable investigation into the circumstances of the claim before denying coverage. *Id.* at 1054-55 (citing *Am. Int'l Bank v. Fidelity and Deposit Co.*, 49 Cal. App.4th 1558, 1571 (1996)).

Under California law, an insurer's duty to defend is not synonymous with its duty to indemnify its insured. *Certain Underwriters at Lloyd's of London v. Super. Ct.*, 24 Cal.4th, 945, 958 (2001).  The duty to defend is broader than the duty to indemnify: the defense duty attaches when a policy is ambiguous and the insured would "reasonably expect the insurer to defend him or her against the suit based on the nature and kind of risk covered by the policy, or when the underlying suit potentially seeks damages within the coverage of the policy." *Wesco Ins. Co. v. Brad Ingram Construction*, No. 22-16584, 2024 WL 243344, at *2 (9th Cir. 2024) (quoting

1   *Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co.*, 18 Cal.4th 857, 869 (1998)).

2       "To prevail in an action seeking declaratory relief on the question of the duty to defend,

3   the insured must prove the existence of a *potential for coverage*, while the insurer must establish

4   *the absence of any such potential*.  In other words, the insured need only show that the underlying

5   claim *may* fall within policy coverage; the insurer must prove that it *cannot." Delgado v.*

6   *Interinsurance Exch. of Auto. Club of S. Cal.*, 47 Cal.4th 302, 308 (2009) (internal citations and

7   quotations omitted) (emphasis in original).  Interpretation of insurance policy language is a

8   question of law that follows the general rules of contract interpretation and properly may be

9   decided in a motion for summary judgment.  *RLI Ins. Co. v. City of Visalia*, 297 F. Supp.3d 1038,

10  1048-49 (E.D. Cal. 2018); *Nat'l Fire Ins. Co. v. Martinelli* (*Martinelli*), No. 07-CV-01056-AWI-

11  GSA, 2008 WL 2725070, at *5 (E.D. Cal. July 11, 2008) (citing *MacKinnon v. Truck Ins. Exch.*,

12  31 Cal.4th 635, 641 (2003)).

13      "The fundamental rules of contract interpretation are based on the premise that the

14  interpretation of a contract must give effect to the 'mutual intention' of the parties" which, if

15  possible, should be inferred solely from the written provisions of the contract.  *MacKinnon*, 31

16  Cal.4th at 647.  "If contractual language is clear and explicit, it governs." *ACL Techs., Inc. v.*

17  *Northbrook Prop. & Cas. Ins. Co.*, 17 Cal. App.4th 1773, 1784 (1993), *as modified* (Sept. 21,

18  1993) (quoting *Bank of the West v. Super. Ct.*, 2 Cal.4th 1254, 1264 (1992) (*en banc*)).

19      The rules governing policy interpretation require a court to first look to the language of

20  the contract to ascertain its plain meaning or the meaning a layperson would generally ascribe to

21  it.  *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 18 (1995) (citing Cal. Civ. Code §1638;

22  *Reserve Ins. Co. v. Pisciotta*, 30 Cal.3d 800, 807 (1982)).  "A contract term will be considered

23  ambiguous when it is capable of two or more constructions, both of which are reasonable.  But

24  'courts will not strain to create an ambiguity where none exists.'" *Westport Ins. Co. v. Northern*

25  *California Relief*, 76 F. Supp.3d 869, 889 (N.D. Cal. 2014) (quoting *Waller*, 11 Cal.4th at 18).

26  "[L]anguage in a contract must be interpreted as a whole, and in the circumstances of the case,

27  and cannot be found to be ambiguous in the abstract." *Waller*, 11 Cal.4th at 19.  Therefore, to

28  determine whether the allegations in a complaint give rise to coverage under a policy, the court

8

1  must consider both occurrence language in the policy, and the endorsements broadening coverage

2  (if any) in the policy terms. *Id.*

3      Put another way, "[b]efore even considering exclusions, a court must examine the

4  coverage provisions to determine whether a claim falls within the policy terms." *Id.* at 16.  The

5  insured bears the burden of proof, but the insuring agreement language in a policy is interpreted

6  broadly in favor of coverage. *See AIU*, 51 Cal.3d at 822 ("[W]e generally interpret the coverage

7  clauses of insurance policies broadly, protecting the objectively reasonable expectations of the

8  insured.").

9      If the insured proves the claim falls within policy terms, the burden shifts to the insurer to

10  prove that an exclusion applies.  *Universal Cable Prods., LLC v. Atl. Specialty Ins. Co.*, 929 F.3d

11  1143, 1151 (9th Cir. 2019) ("The burden is on the insured to establish that the claim is within the

12  basic scope of coverage and on the insurer to establish that the claim is specifically excluded.")

13  (quoting *MacKinnon*, 31 Cal.4th at 648).

14      "An insurer may rely on an exclusion to deny coverage only if it provides *conclusive*

15  *evidence* demonstrating that the exclusion applies." *Atlantic Mut. Ins. Co. v. J. Lamb, Inc.*, 100

16  Cal. App.4th 1017, 1038-39 (2002) (emphasis in original).  Furthermore, exceptions to the

17  performance of basic underlying contract obligations must be clearly stated to inform the insured

18  of the effect of those exceptions.  *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 269 (1996) (*en banc*).

19  "Whereas coverage clauses are interpreted broadly to afford the greatest possible protection to the

20  insured, exclusionary clauses are construed narrowly against the insurer." *Cont'l Cas. Co. v. City*

21  *of Richmond*, 763 F.3d 1076, 1079 (9th Cir. 1985).  Thus, "[a]ny doubt as to whether the facts

22  give rise to a duty to defend is resolved in favor of the insured." *Legarra v. Federated Mut. Ins.*

23  *Co.*, 35 Cal. App.4th 1472, 1479 (1995).  However, "[c]ourts may not rewrite the insurance

24  contract or force a conclusion to exact liability where none was contemplated." *Id.* at 1480.  "The

25  insurer has the right to limit the coverage of a policy issued by it and when it has done so, the

26  plain language of the limitation must be respected."  *Reg'l Steel Corp. v. Liberty Surplus Ins.*

27  *Corp.*, 226 Cal. App.4th 1377, 1394 (2014) (internal citation omitted).

28  ///

**B.  Duty to Defend – Discussion**

Here, Palla asserts that Gemini had a duty to provide coverage under Coverage A of the CGL Policies for "property damage" caused by an "occurrence."  *See* (Doc. 32-2 at 9).  Relevant to this issue, Clause IIA, Bodily Injury and Property Damage Liability, provides:

> **WE** will pay the amounts that an **INSURED** becomes legally obligated to pay as damages because of **BODILY INJURY** or **PROPERTY DAMAGE** caused by an **OCCURRENCE** for which this policy applies.

(JSUF, Exs. A at GEM000012, B at GEM000058, C at GEM000104, D at GEM000151).  The coverage clauses are subject to exclusions under Section VII of the CGL Policies. Pertinent here, Section VII.B., Bodily Injury and Property Damage Liability Exclusions (the "Pollution Exclusion"), excludes coverage for pollution as follows:

> **13. <u>Pollution</u>**:
>
> a.    **BODILY INJURY** or **PROPERTY DAMAGE** arising out of or resulting from the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of POLLUTANTS:
>
> (**1**) At or from any premises, site, or location which is or was at any time owned or occupied by, or rented or loaned to, any **INSURED**….

(JSUF Exs. A at GEM000023, B at GEM000069, C at GEM000161, D at GEM000161). In addition, "pollutants" are defined by the CGL Policies as: "[A]ny solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and **WASTE**."  (JSUF Exs. A at GEM000035; B at GEM000081, C at GEM000127, D at GEM000174).  Under the CGL Policies, "waste" is defined as follows:

> **WASTE** means discarded, unusable, or unwanted substances or materials and includes to be materials to be disposed of, recycled, reconditioned, or reclaimed.  Fluids or substances, including, but not limited to, drilling mud, saltwater, and produced fluids, injected or recovered from the **WELL BORE** at an **OIL OR GAS SITE**, will not be included in the meaning of **WASTE**.

(JSUF Exs. A at GEM000040, B at GEM000086, C at GEM000129, D at GEM000226).

The key question in this case determinative of whether Gemini has a duty to defend is

1   whether the Pollution Exclusion operates to bar coverage.  The answer to that question requires

2   the Court to resolve whether the substance at issue (injected saltwater) falls within or is excepted

3   from the definition of "waste" and how the CGL Polices' waste definition impacts the Pollution

4   Exclusion.

5        The parties dispute whether the express exception of saltwater and other fluids injected or

6   recovered from the well bore from the definition of "waste" likewise excepts these substances

7   from the definition of "pollutants."  Thus, Palla interprets "pollutants" to mean materials that are

8   to be disposed of, so long as they are also "irritants or contaminants," unless the material is

9   excepted from the definition of "waste."  Gemini argues that since pollutants are defined as any

10   "solid, liquid, gaseous, or contaminant, including … waste," a substance (such as the saltwater

11   and related by-products at issue in the Underlying Action) does not need to be both an "irritant or

12   contaminant" and "waste" to satisfy the definition of "pollutant."  Instead, Gemini argues that

13   irritants, contaminants, and waste are merely examples of pollutants.

14        In support of its position, Gemini cites a series of cases involving the courts' interpretation

15   of pollution exclusion clauses similar to the exclusion at issue here.  First, in *Garamendi v.*

16   *Golden Eagle Ins. Co.*, 127 Cal. App.4th 480 (2005), the insurer relied on a pollution exclusion

17   clause to decline to defend its insured in connection with employee claims against the insured for

18   injuries resulting from their inhalation of silica dust.  *Id.* at 484-85.  The insured argued that silica

19   was not a covered "pollutant" that triggered the pollution exclusion clause, which defined

20   pollutants as "any solid, liquid, gaseous, or thermal irritant or contaminant including smoke,

21   vapor, soot, fumes, acid, alkalis, chemicals [or] waste."  The court rejected the insured's

22   argument and held that, even assuming silica was not specifically named within the definition of

23   pollutant, silica nevertheless was capture by the more general categories of "irritant and

24   contaminant."  *Id.* at 486.

25        Similarly, in *Ortega Rock Quarry v. Golden Eagle Ins. Corp.*, 141 Cal. App.4th 969, the

26   court rejected an insured's argument that under the doctrine of *ejusdem generis*, the only

27   "irritants" or "contaminants" that trigger a pollution exclusion are those that are expressly

28   enumerated after the word "including" in the definition of "pollutants."  *Id.* at 980, 990.  The

*Ortega Rock Quarry* court reasoned in part that "the word 'including' in a statute is 'ordinarily a term of enlargement rather than limitation.'" *Id*. at 982 (quoting *Hassan v. Mercy American River Hospital*, 31 Cal.4th 709, 717 (2003)).  Likewise, the court in *The Villa Los Alamos Homeowners Assn. v. State Farm General Ins. Co.* (*Villa Los Alamos*), relying on *Ortega Rock Quarry*, found that asbestos triggered a similarly worded pollution exclusion clause, notwithstanding that asbestos was not specifically named among other identified substances, because it more generally was a covered "irritant or contaminant."  198 Cal. App.4th 522, 527, 536540 (2011).

Finally, in *Martinelli*, the insured allegedly caused a saltwater flood which inundated approximately 40 acres of olive orchards and 40 acres of grape vineyards in adjacent properties, resulting in the destruction of crops and contamination of soil in adjacent properties. *Martinelli*, 2008 WL 2725070, at *1.  In declining coverage, the insurer invoked the applicable pollution exclusion clause virtually identical to the Pollution Exclusion at issue here, arguing that the saltwater constituted a "pollutant."  Relying on *MacKinnon*, the court framed the question as whether saltwater "could be 'commonly thought of as a pollution' under the circumstances" of the case.  *Id*. at *10 (quoting *MacKinnon*, 31 Cal.4th at 653).  Notwithstanding that saltwater was neither named in the definition of "pollutant" nor encompassed in the sub-definition of "waste," the court found that "[t]o olive trees and grapevines, a massive amount of saltwater too is 'an impurity, something objectionable and unwanted' that pollutes the crops and the soil they grow in, regardless of whether it is chemical, toxic or a hazardous waste, or even natural." *Id*. at *11. As such, the court held that the pollution exclusion operated to bar coverage.  *Id.*

Palla correctly argues that Gemini's cited caselaw is not entirely on point because, unlike the pollution exclusion clauses at issue in the cases cited by Gemini, the Pollution Exclusion in the CGL Policies expressly excepts from one of the categories of enumerated pollutants ("waste") the precise substance at issue here (injected saltwater).  According to Palla, "all 'Waste' is a 'Pollutant' except for 'Waste' that is in the form of fluids 'injected or recovered' from a well on which Dole is 'conducting oil … exploration or production.' Such fluids do not constitute 'Waste' and thus are not a 'Pollutant' as defined by the policy."  (Doc. 38 p. 7).  The Court agrees with Palla that the injected saltwater at issue here is excepted from the definition of waste under the

1    CGL Policies; however, the Court is not convinced that this conclusion necessarily requires a

2    finding that injected saltwater cannot constitute a pollutant.

3          During the motion hearing, the Court asked counsel for Gemini what purpose could be

4    served by excepting saltwater from the definition of waste if the tailored definition would be

5    preempted by the Pollution Exclusion in any event. (Doc. 56 p. 29). Counsel for Gemini provided

6    the following response:

7               If waste included saltwater, then there would never be coverage for
                pollution caused by saltwater, and that's not what the policy provides.
8               It provides coverage for reinjected saltwater into borewells when
                they meet an eligible pollution event, but the policy provides for an
9               absolute exclusion for pollution caused by waste. So, by carving out
                saltwater from waste, it allows coverage if a qualified pollution event
10              is met. It doesn't -- and that's why it's carved out. So it's still an irritant
                or contaminant, saltwater. It's just not waste. And what that does is,
11              waste is always excluded, whereas pollutants are only -- are covered
                when there's a qualified pollution event.
12

13   (Doc. 56 pp. 31-32).

14         The Court finds that the distinction described above between a "pollutant" and a

15   "pollutant" that is also "waste" properly is considered in the context of interpreting the CGL

16   Policies as a whole, and in particular, in assessing the operation of the waste endorsement

17   (defining "waste," including its exceptions). *See Waller*, 11 Cal.4th at 19 (reiterating California

18   rules of contractual interpretation that direct a court to interpret the contract as a

19   whole – including in the light of the "circumstances of the case" – and to avoid finding language

20   ambiguous in the abstract).

21          Section IIB of the CGL Policies operates as the "buyback" clause that covers pollution

22   events provided the insured meets certain pre-existing conditions.  (Doc. 31 at 13).  Pollution

23   buyback provisions allow insurers to provide high risk coverage while also lowering its own risk

24   by implementing reporting time limits for a claim.  *See Venoco, Inc. v. Gulf Underwriters Ins.

25   Co.*, 175 Cal. App.4th 750, 761-62 (2009) (citing *Pacific Employers Ins. Co. v. Super. Ct.*, 221

26   Cal. App.3d 1348, 1359-60 (1990)).  These buyback conditions allow coverage for high-risk

27   business at a reasonable price, where such coverage would not otherwise be available.  *Id.*

28          "Pollution buy-back provisions containing reporting time limits are not unusual in the oil

13

1  industry." *Id*. at 759 (citing *inter alia Matador Petroleum v. St. Paul Surplus Lines Ins.*, 174 F.3d

2  653,656-57 (5th Cir. 1999); *Certain Underwriters at Lloyd's v. C.A. Turner Constr.*, 112 F.3d

3  184, 189 (5th Cir. 1997)).  Courts consider these insurance contract provisions to be fair and not

4  in contravention of public policy since "[u]nderwriters, secure in the fact that claims will not arise

5  under the subject policy after its expiration or termination can underwrite a risk and compute

6  premiums with greater certainty.  An insurance company can establish its reserves without having

7  to consider the possibilities of inflation beyond the policy period, upward-spiralling jury awards,

8  or later changes in the definition and application of negligence." *Venoco*, 175 Cal. App.4th at 762

9  (quoting *Pacific Employers Ins. Co.*, 221 Cal. App.3d at 1359).

10        Clause IIB, "Pollution Clean Up Costs," though not addressed extensively by the parties,

11  operates as a buyback clause and provides meaningful context for considering the definition of

12  "waste" within the CGL Policies. Clause IIB states:

> **WE** will pay the amounts that **YOU** voluntarily incur or become legally obligated to pay as **POLLUTION CLEAN UP COSTS** because of a **POLLUTION INCIDENT** which has commenced at or from **YOUR OIL OR GAS SITE** or **YOUR WORK** at an **OIL OR GAS SITE**, provided the following **ELIGIBLE POLLUTION INCIDENT** requirements are met:
>
> The **POLLUTION INCIDENT** is both unexpected and unintended from the standpoint of the **INSURED**;
>
> The **POLLUTION INCIDENT** commenced abruptly and instantaneously and can be identified as having first commenced during the policy period;
>
> The **POLLUTION INCIDENT** was known by any **INSURED**, **AGENT**, **OPERATOR** or **OIL OR GAS SITE CONTRACTOR** within 30 days of the commencement of the **POLLUTION INCIDENT**, and
>
> The **POLLUTION INCIDENT** was reported to **BERKLEY OIL & GAS SPECIALTY SERVICES, LLC** as soon as practicable but no later than 90 days from the date of knowledge of the commencement of the **POLLUTION INCIDENT**.
>
> However, if **YOU** own a **NON-OPERATING WORKING INTEREST** in an **OIL OR GAS SITE** that has a **POLLUTION INCIDENT**, **YOU** must report to **BERKLEY OIL & GAS SPECIALTY SERVICES, LLC** as soon as practicable but no later than 120 days from the date of knowledge of the commencement of the **POLLUTION INCIDENT**.

(JSUF Exs. A at GEM000012-13, B at GEM000058-59, C at GEM000104-05, D at GEM 000151-52).  Section IIB creates a limited exception to the Pollution Exclusion.  This limited exception would operate only if Dole met the four conditions set forth above.  *See Venoco*, 175 Cal. App.4th at 761.  These eligible pollution incidents covered by the buyback provision are subject to their own set of exclusions that implicate the CGL Policies' tailored definition of "waste."  For example, the CGL Policies contain the following exception to the "buyback" clause:

> This policy does not apply to: …
>
> 3. **Waste**
>
> **POLLUTION CLEAN UP COSTS** arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of **POLLUTANTS** which are or were at any time transported, handled, stored, disposed of, or processed as **WASTE**.

(JSUF Exs. A at GEM00024, B at GEM000070, C at GEM000116, D at GEM000163).  This distinction between "pollutants" and "waste pollutants" is meaningful to the question presented in this case relating to operation of the Pollution Exclusion.  Under the buyback provision, the CGL Policies cover pollution cleanup costs arising from the release or escape of pollutants, unless they were at some point processed as "waste."  Based on this, the Court finds that the distinction of saltwater as a "pollutant," but not "waste," was deliberately contemplated as a meaningful operation of the CGL Policies when considering those policies "as a whole" and in the light of the "circumstances of the case."  *Waller*, 11 Cal.4th at 19.

At the motion hearing, counsel for Palla argued that a reasonable policyholder would read the waste endorsement as a carve out of waste from the definition of "pollutants."  Counsel for Palla further argued that if Gemini wanted to restore coverage just for claims under Section IIB, then it could have made the waste exclusion definition applicable just to Section IIB, but did not do so.  Palla's argument is unconvincing when reading the CGL Policies as a whole and in light of the circumstances of the case.  During the hearing, counsel for Palla further stated:

> And just to dovetail, we started this discussion with the four cases that Mr. Potente cited to the Court, all of which said the word

15

"including" is not exclusive, but, rather, is demonstrative.  I have no quarrel with that.  I agree.  If there was no exception in the definition of "waste" for saltwater, none of us would be here.

(Doc. 58-1 p. 33).

As set forth above, the waste endorsement changes the definition of "waste" and not the definition of "pollutants" under the CGL Policies.  Although Dole's alleged injection of saltwater might be excepted from the definition of "waste," that does not mean *perforce* that the saltwater is not a "pollutant."  The endorsement defining "waste" is not ambiguous and is meaningful elsewhere in the policies – specifically, as discussed above, in connection with operation of the buyback conditions as described above. "Courts may not rewrite the insurance contract or force a conclusion to exact liability where none was contemplated." *Legarra*, 35 Cal. App.4th at 1480. "An insurer may select the risks it will insure and those it will not, and a clear exclusion will be respected." *Id*. (citing *Howell v. State Farm Fire & Cas. Co.*, 218 Cal. App.3d 144, 1467 (1990)).

Interpreting the waste endorsement to serve as a modification of the definition of "pollutants" would run contrary to the parties' contract.  Importantly, if the Court accepted Palla's arguments, the wholesale exception of injected saltwater as a pollutant would contravene the definition of pollutant elsewhere in the contract.  Indeed, the distinction between waste and non-pollutant waste serves a purpose in other parts of the CGL Policies, such as the exclusion for clean-up costs.  *See* (JSUF Ex. B at GEM000070).  The language of that exclusion evinces the parties' understanding that certain materials may not constitute "waste" but nevertheless constitute a "pollutant," which is why the policies expressly exclude coverage for clean-up costs resulting from "pollutants … processed as waste." *Id.*  In short, Palla's interpretation of the waste endorsement would trigger coverage notwithstanding the unambiguous absolute pollution exclusion and undermine the parties' intentions as contemplated in the buyback section.

**IV.   Conclusion**

For the reasons set forth above, Palla's claims are foreclosed by the Pollution Exclusion under the CGL Policies and Gemini does not have a duty to defend Palla.  Accordingly, the Court HEREBY ORDERS that:

1.   Gemini's motion for summary judgment (Doc. 31) is **GRANTED**;

16

2. Palla's motion for summary judgment (Doc. 32) is **DENIED**; and

3. The parties' motions for administrative relief (Docs. 45, 47) and request to narrow issues (Doc. 58) are **DENIED** as **MOOT**.

The Clerk of the Court is **DIRECTED** to enter judgement in favor of Defendant Gemini Insurance Company and to **CLOSE** this case.

IT IS SO ORDERED.

Dated:   **August 12, 2024**   _____

UNITED STATES MAGISTRATE JUDGE